UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* DOUGLAS MALIE,<br><br>Plaintiffs,<br><br>vs.<br><br>FIRST COAST CARDIOVASCULAR INSTITUTE<br><br>Defendant. | Civil Action No.: 3:16-cv-1054-J-34MCR<br><br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730(b)(2) |

## AMENDED COMPLAINT

*Qui tam* relator, Douglas Malie, brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (hereafter "FCA") and the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.* (hereafter "Florida FCA"), on behalf of the United States of America and the State of Florida to recover funds of which the federal and state governments have been defrauded. Relator's allegations are based upon her own knowledge and an investigation undertaken by her counsel. Relator alleges the following:

### NATURE OF THE CASE

1. This *qui tam* action is an effort to restore to the United States and the State of Florida nearly one million dollars that Defendant has knowingly retained in overpayments received through through the Medicare and Medicaid programs.

2. The Defendant owns and operates at least ten medical offices throughout Florida, and is headquartered in Jacksonville.

1



3. The fraud alleged herein began no later than April of 2015, and continues to this day.

## PARTIES

4. Defendant, First Coast Cardiovascular Institute, P.A., (hereinafter "First Coast") is an entity organized and existing under the laws of the State of Florida. Its headquarters is located at 7011 AC Skinner Parkway, Ste 160, Jacksonville, FL 32256. Defendant is in the business of owning and operating health clinics throughout the counties of Duval, Clay, St. John's and Putnam in the State of Florida. Defendant's central billing office, and the location where Relator physically reported to work, is located at 6820 Southpoint Parkway, Ste 4, Jacksonville, FL 32256.

5. Relator, Douglas Malie, is a citizen of the State of Florida. Beginning in April of 2015, Relator was employed in Defendant's headquarters as the Executive Director. His employment agreement provided that his duties were to include, *inter alia*, "actively managing [First Coast's] business and management team subject to the direction of [First Coast's President and] Board of Directors," as well as "participat[ing] in," *inter alia*, "compliance," "legal matters" and "financial matters."

6. The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein (Medicare claims in full and Medicaid claims in part) and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by the Centers for Medicare & Medicaid Services (hereafter "CMS") for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

7. The State of Florida is a real party in interest under the Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.*, and ultimately paid a portion of the false Medicaid claims alleged herein. *See* 42 U.S.C. §§ 1396-1396v.

## JURISDICTION AND VENUE

8. Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA, and the State of Florida under the Florida FCA.

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730. This Court has supplemental jurisdiction over the counts asserted under the Florida FCA, pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

10. This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants are found, transact business, and committed violations of 31 U.S.C. § 3729 in this District.

11. This action is not based upon the prior public disclosure of allegations or transactions in a Federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in either the FCA or the Florida FCA.

12. To the extent there has been a public disclosure unknown to Relator, he is an original source under 31 U.S.C. § 3730(e)(4) and Fla. Stat. Ann. § 68.087. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which his allegations are based and/or has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

3

## RELEVANT STATUTES AND REGULATIONS

A.  The False Claims Act, 31 U.S.C. § 3729, *ET SEQ.*

13.  The False Claims Act imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval (hereafter "false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA also imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money" to the Government.

14.  The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2).

15.  The FCA defines "obligation" as an established duty, whether or not fixed, that arises from a contract, statute, regulation or the "retention of any overpayment." 31 U.S.C. § 3729(b)(3).

16.  The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity. A specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

17.  The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

18.  It is a violation of the FCA to retain an overpayment. *See* 42 U.S.C. § 1320a-7k(d). 42 U.S.C. § 1320a-7k(d)(4)(B) defines "overpayment" as "funds that a person receives or

4

retains under subchapter XVIII or XIX of this chapter to which the person, after applicable reconciliation, is not entitled under such subchapter."

19. A person receiving an overpayment must report, return and give the reason, in writing, for the overpayment to the Secretary, State, intermediary, carrier or contractor as appropriate. 42 U.S.C. § 1320a-7k(d)(1)(A)-(B). The overpayment must be reported and returned within sixty (60) days after the overpayment is identified or the date any corresponding cost report is due, whichever date is later. 42 U.S.C. § 1320a-7k(d)(2)(A)-(B).

20. 42 U.S.C. § 1320a-7k(d)(e) further provides that any "overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation (as defined in section 3729(b)(3) of Title 31) for purposes of section 3729 . . . ."

B. **THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. § 68.081 *ET SEQ.***

21. The Florida FCA also prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the State of Florida. Fla. Stat. Ann. § 68.082(2)(g).

22. Like its federal counterpart, the Florida FCA defines "obligation" as "an established duty, fixed or otherwise, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, *or from the retention of any overpayment.*" Fla. Stat. Ann. § 68.082(1)(e) (emphasis added).

23. The Florida FCA provides that a person acts "knowingly" if that person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. Fla. Stat. Ann. 68.082(1)(c).

### C. FEDERAL AND STATE HEALTH CARE PLANS

24. Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million persons. Medicare is administered by a federal agency, namely the Centers for Medicare and Medicaid Services (hereafter "CMS"). Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *Id.*

25. Medicare is divided into several parts, of which Medicare Parts B and C are relevant to this action.

26. Medicare Part B covers, among other things, physician services and services and supplies that are furnished incident to a physician's professional services. *See* 42 C.F.R. § 410.10(a)-(b). Medicare Part B is a retrospective payment system, whereby providers bill Medicare on a per-service basis. Defendants bill Medicare directly under Part B.

27. Medicare Part B is a voluntary supplementary health insurance program that is financed by premium payments from enrollees and funds provided by the federal government. Generally, a person who enrolls in Part B is required to pay a monthly premium. Enrollees are also generally responsible to pay a deductible and coinsurance for services rendered.

28. Similarly, Medicare Part C, commonly known as "Medicare Advantage," consists of private HMOs that are paid by CMS on a per-patient, per-month basis to provide Part A and B benefits to their enrollees. As with other Medicare Parts, enrollees are responsible for some out-of-pocket deductibles.

29. Railroad Medicare is similar to Medicare, except it is funded in part by the United States Railroad Retirement Board, using federal funds distinct from those available under the Social Security program.

6

30. Tricare is a federally-funded health insurance program for veterans of the military and their family members.

31. Medicaid was also created by Congress in 1965. *See* 42 U.S.C. §§ 1396-1396v. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services (hereafter "HHS") through CMS. *See* 42 U.S.C. §1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. §1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " *See* 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation.

32. Some enrollees that have limited income and limited resources are entitled to both Medicare and Medicaid benefits. These enrollees, often referred to as dual eligibles, are entitled to benefits ranging from payment of certain costs, such as Medicare premiums, to full benefits under Medicaid. Whether entitled to full or partial Medicaid benefits, Medicare serves as the primary insurer and Medicaid as the secondary insurer for dual eligible participants.

D. **COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT UNDER BOTH PROGRAMS**

33. To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting documentation to Medicare. If the provider's application is accepted by Medicare, the supplier is then eligible to receive Medicare payments. If the provider's application is accepted by Florida

7

Medicaid, a prerequisite of which is acceptance by Medicare, the provider is then eligible to receive Medicaid payments.

34.     Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA and Florida FCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements for purposes of the FCA and Florida FCA. Retaining an overpayment also violates the FCA and Florida FCA.

**DEFENDANT'S UNLAWFUL RETENTION OF OVERPAYMENTS**

35.     According to First Coast's website, Defendant owns and operates facilities at the following locations:

   a.  **Southside Office**
       7011 AC Skinner Parkway, Ste 160
       Jacksonville, FL 32256

   b.  **Jacksonville Beach Office**
       905 Beach Boulevard
       Jacksonville Beach, FL 32250

   c.  **Mandarin Office**
       9759 San Jose Boulevard, Ste 2
       Jacksonville, FL 32257

   d.  **Northside Office**
       3890 Dunn Avenue, Ste 203
       Jacksonville, FL 32218

   e.  **Arlington Office**
       1201 Monument Rd, Ste 201B
       Jacksonville, FL 32225

   f.  **Westside Office**
       5233 Ricker Rd., Ste 101
       Jacksonville, FL 32210

      g. **Fleming Island Office & Sleep Lab**
         1681 Eagle Harbor Parkway East, Ste B
         Fleming Island, FL 32003

      h. **St. Augustine Office**
         1100 Plantation Island Drive
         St. Augustine, FL 32080

      i. **County Road 210 Office**
         300 Kingsley Lake Drive, Ste. 402
         St. Augustine, FL 32092

      j. **Palatka Office**
         524 Zeagler Drive
         Palatka, FL 32177

36. Additionally, Defendant maintains a Central Billing Office at 6820 Southpoint Parkway, Ste 4, Jacksonville FL 32256.

37. At its offices, Defendant provides a variety of clinical and laboratory services which are billed to Medicare, Medicaid, and private insurers, as set forth above.

38. On some occasions, Defendant has over-billed for services. Such over-billing can occur for a variety of reasons, even innocently – for example, where a patient has two different insurances, sometimes both are billed as a primary insurer, or where an insurer is inadvertently billed twice for the same procedure, and so forth. This is a normal occurrence in the health care field.

39. Relator has worked in health care administration since 1993. In Relator's experience, the standard method for dealing with over-billing is for the health care provider to issue a credit on its balance sheet, and to refund the overpayment back to the payor or patient as part of the normal accounts payable process.

40. Relator began working for Defendant in April of 2015. Almost immediately, Relator noticed that Defendant's records did not reflect a credit balance for overpayments.

9

Because the overpayments were in excess of $100,000, Relator determined that such a credit balance should be reflected in Defendant's financial statements.

41. Relator promptly alerted the CFO, Ashraf Shaikh ("Shaikh"), as well as his superiors, including the President and Board of Directors, that there was a problem.

42. Specifically, on May 18, 2015, Relator asked that Shaikh send him the previous month's Profit & Loss statement so that he could familiarize himself with the company's financial situation. Upon reviewing that P&L statement, Relator emailed Shaikh the following:

> Thank you Ash. Please help me understand the liability associated with Employee Insurance. Also, I don't see a liability account for credit balances which, if memory serves me correctly, is >$100,000. Shouldn't we include this in our financials?

43. Relator then forwarded his email to his superiors, with the following commentary:

> A half million dollar liability associated with employee insurance?
>
> Also, note my comment about credit balances...as per my conversation with [Director of Revenue Cycle] Brenda [Beckwith], no one is looking at this (measuring) or working on cleaning this up (managing). (emphasis added).

44. The response was fairly disinterested – it consisted of "not sure what that is" and asked Relator to compile a list of issues that needed to be addressed.

45. In the course of investigating further, it quickly became apparent to Relator that the previous Executive Director, David Pitman had been reluctant to raise this issue with his superiors or the Board.

46. Concerned, Relator continued to press the issue. On June 1, 2015, Relator wrote an email stating:

> As of 5/31/15 we have $1,026,009 in credit balances. I suggest we start carrying that as a liability on our Balance Sheet. In the meantime, we will launch an initiative to address this issue once we've stabilized our staffing issues in the CBO.

47. The same day, one of the board members responded, stating:

> Unless there is a strong reason to believe that this is a "new" negative balance
> I will take responsibility on NOT adding this now to our statements if our financial books never had reflected it before, it will only confuse banks.
>
> My understanding is that this has been there for the life of the practice and was just never brought up to the financial dept, because it was never reported separately.
>
> If so there is no reason to bring it to the financial books till we learn it a whole lot more
> Let us discuss in person

48. Despite that email, no discussion ever occurred, in person or otherwise.

49. Relator continued to regularly raise this issue, often several times a month but in no event less than monthly, as he reviewed each subsequent P&L report. Despite Relator's frequent attempts to have this issue rectified, he was repeatedly ignored.

50. As Relator performed his other duties, one possible explanation for Defendant's reluctance to address the overpayments came to light – although First Coast was determined to expand its practice, it was also in substantial debt.

51. On February 24, 2016, Relator sent an email explaining why he was concerned that certain projects would not be feasible because they would be unable to borrow the funds. In that email, Relator stated:

> Please don't think I'm being argumentative...just concerned but they will only continue to lend if they think our cash flow is sufficient enough to service our debt. *You probably don't know this but we have another liability hanging around our neck and it's credit balances. This practice for many years has failed to issue credit balances as they came in so we are sitting on $1.2M in credit balances that may or may not be valid. We won't know until each one is researched but that doesn't change the fact that right now those balances are in our accounts receivable.* Here's a snapshot of our liabilities:
>
> Aschi payments: $625k

11

> ***Credit balances: $1.2M***
>
> Ameris SBA: $5.0M
>
> Ahmed Khatib: $500k
>
> Hancock: $425k
>
> Ameris: $1.2M
>
> Physician bonuses: $240k
>
> Partner back pay: $70k
>
> That's a total of $9.3M in debt without either of the two cath labs. I guess we need to figure out how much debt our cash flow will service AND provide us with some cushion. (Emphasis added).

52. The same day, the recipient responded:

> On a serious note Whats a credit balance and whenIs this now an issue ? *Considering we didn't care about this for years* (Emphasis added, typos in original).

53. Relator explained:

> A credit balance occurs when:
>
> - Insurer overpayments or duplicate payments
>
> - Coordination of benefit conflicts
>
> - Improper upfront collections
>
> - Charge corrections
>
> Either way, it's not our money and is considered <u>unclaimed property</u>. You'd have to ask someone else why this was ignored for so many years. What I can tell you is that *I've been asking about what to do with these and I've been reporting them internally every month since May of last year.* Part of the problem since I've been here is that we haven't had the funds to issue credit balances. Maybe that is why Ash chose not to do anything with them as well. Now that we've done a conversion, these need to be dealt with as part of our spin down of Allscripts AR. (Underlining in original; other emphasis added).

12

54. In his response email, Relator also forwarded a summary of Florida's unclaimed property statute, and cc'ed Brenda Beckwith, Director of Revenue Cycle. Ms. Beckwith promptly chimed in, saying:

> That is correct … ***until Doug arrived nobody even asked about the credit balances.*** David probably did not want to discuss them and as such never once brought them up., and Ash was covered up with so many things this was not moved forward. Each of these are being gone thru individually to make sure that the payments and adjustments were taken correctly and there is an actual credit balance. We will be assigning 24 man hours per week to go thru these starting Tuesday March 1st. (Emphasis added).

55. Thus, as the emails above clearly show, Defendant was aware no later than May 18, 2015, that it had received overpayments, including overpayments of federal funds from, *inter alia*, Medicare, Railroad Medicare, Medicare HMOs, Medicaid, Medicaid HMOs, and Tri-Care. Defendant should therefore have refunded the overpayments no later than July 17, 2015.

56. Contrary to the statements made by Ms. Beckwith above, no action has been taken to correct this situation. Relator repeatedly asked Ms. Beckwith about the "review" that she said was to be undertaken beginning on March 1 of 2016 – Ms. Beckwith ignored or deflected Relator's questions.

57. Lest there be any doubt, Relator reiterated his concerns again. Indeed, on February 15, 2016 – just a few days before the above email exchange – Relator again raised the overpayment issue with Defendant's management. Specifically, Relator emailed:

> We've talked about this before but I just want to remind you that we have $1.285M in credit balances. Technically this is a liability that should be on our balance sheet.

58. Defendant responded by asking for an accounting of how far back the overpayments went, which Relator agreed to work with Ms. Beckwith to provide.

59. Despite this apparently promising development, Defendant, through its agents, continued to ignore or deflect the issue. Finally, on June 29, 2016, Relator sent the following

email, which attached CMS's final rule regarding overpayments, to his superiors and to Ms. Beckwith:

> I have brought the credit balance issue to your attention several times over the last year. In light of this final rule (please see attached), I would strongly recommend that an evaluation be conducted to identify any credit balance due to Medicare/Medicaid greater than 60 days and that those funds be returned immediately. Failure to do so could result in fines of between $5,500 and $11,000 per claim PLUS treble (3X) damages associated with Medicaid claims specifically. Please be aware that there is a 6 year look back meaning that this applies to any claim on or after June 2010.

60.  First Coast's response was incredibly telling. Despite assurances some four and a half months prior to review the overpayment issue, the response was:

> thanks a lot Doug
>
> absolutely
>
> ***Brenda pls have that report for us to look at no later than mid next week***
>
> I am available this friday after 1 as well (Emphasis added).

61.  Relator has accessed some of the payment data himself, and has verified that there are multiple payments from federal and state payors that should be refunded, and that have aged well past sixty days—many of them are older than 120 days.

62.  Of the approximately $1.8 million in overpayments, Relator estimates that approximately 40% - 50% of them were from Medicare, and approximately 7%-10% from Medicaid.

63.  Despite Relator's best efforts, Defendant has taken no action to refund the overpayments as of the date of this Complaint.

64.  The balance that should be refunded continues to grow by approximately $15,000 to $30,000 each month.

14

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(G)

65. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 64 as if set forth herein at length.

66. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(G).

67. Defendant has a duty and obligation to notify, report and return any overpayments to the Secretary, state, intermediary, carrier or contractor as appropriate within sixty (60) days of identifying the overpayment or the date any corresponding cost report is due.

68. Instead of reporting and returning overpayments, Defendant knowingly concealed, or knowingly and improperly avoided, an obligation to pay money to the United States government. Defendant reported these improperly kept overpayments as cash or assets in their monthly revenue reports to inflate and disguise their financial status.

69. By virtue of Defendant's knowing refusal to pay the overpayments to Medicare or Medicaid, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT II
## FLORIDA FCA
## Fla. Stat. Ann. § 68.082(g)

70. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 64 as if set forth herein at length.

71. This is a claim for treble damages and civil penalties under the Florida FCA, Fla. Stat. Ann. § 68.083(2).

72. As alleged herein, Defendant violated Fla. Stat. Ann. § 68.082(g) by knowingly

and improperly avoiding their obligation to pay money to Florida Medicaid. Specifically, Defendant knowingly kept overpayments that should have been refunded to Medicaid. Defendant then reported these improperly kept overpayments as cash or assets in their monthly revenue reports to inflate and disguise their financial status.

73. By reason of these payments and improper retention of overpayments, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Relator prays that judgment be entered against Defendant, ordering that:

A. Defendant's assets be frozen until the final resolution of this action; Defendant cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, et seq. and the Florida FCA, Fla. Stat. Ann. § 68.081, *et. seq.*;

B. Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

C. Defendant pay the State of Florida not less than $5,500, and not more than the greater of $11,000 for each violation of Fla. Stat. Ann. § 68.082, plus three times the amount of Medicaid payments paid by the State of Florida because of Defendant's misconduct;

D. Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and Fla. Stat. Ann. § 68.085;

E. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), Fla. Stat. Ann. § 68.085(1)(c) or (2), and any other applicable law or regulation;

F. Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

G. The United States, the State of Florida, and Relator be awarded such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator hereby demands a trial by jury.

DATED: September 22, 2017                    Respectfully submitted,

*/s/ Kevin J. Darken*
Kevin J. Darken, Esq. (Fl. Bar No. 0090956)
**The Cohen Law Group**
201 E. Kennedy Blvd., Suite 1950
Tampa, Florida 33602

**MILBERG LLP**
Roland W. Riggs
rriggs@milberg.com
One Pennsylvania Plaza
New York, NY 10119-0165
(212) 594-5300

*Attorneys for Plaintiff-Relator*
*Douglas Malie*